No. 49,240

STATE OF KANSAS, *Appellee,* v. HAROLD MURRELL, *Appellant.*

(585 P.2d 1017)

Opinion filed October 28, 1978.

*Salvatore A. (Tim) Scimeca, Jr.,* of Wichita, argued the cause and was on the brief for the appellant.

*Robert Sandilos,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Vern Miller,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: This is a direct appeal by Harold Murrell from his conviction by a jury of four felony offenses, aggravated robbery, K.S.A. 21-3427, aggravated assault, K.S.A. 21-3410, and unlawful possession of a firearm, K.S.A. 21-4204(*b*), all committed on November 26, 1975; and unlawful possession of a firearm, K.S.A. 21-4204(*b*), committed at the time of his arrest in September,

1976. He was acquitted of felony murder. The habitual criminal act, K.S.A. 21-4504(2) (since amended by Laws of Kansas, 1978, ch. 120, § 4, effective January 1, 1979) was invoked, and Murrell was sentenced to imprisonment for not less than 45 years nor more than life for aggravated robbery; for not less than nine years nor more than life for aggravated assault; and for not less than nine years nor more than life for each firearms conviction. All sentences are being served consecutively.

Defendant complains of various rulings of the trial court which the defendant claims constitute prejudicial error. We shall discuss each of these claims separately.

The first three offenses arose out of an armed robbery which took place at the G & R Market in Wichita, Kansas, on November 26, 1975. George Immich, the owner, and Terry Simpson, an employee, were working in the store. Immich was at the cash register and Simpson was shelving groceries in an aisle some distance away.

Two black men entered the store; the younger of the two purchased a package of cigarettes; the other, identified as Murrell, pulled a snub-nosed revolver from his pocket and pointed it at Immich's head. The robbers ordered Simpson to lie down, and he complied. The younger man then took money from Immich's person and from the cash register. Both men fled on foot. Immich grabbed his own revolver and gave chase; Murrell shot at Immich; Immich returned the fire and apparently struck the younger robber in the hip; Murrell fired again at Immich; and the robbers then made good their escape on foot, with Murrell helping the younger man. The police found the younger robber, identified as Joe Clay, lying in the snow about two blocks from the market. Clay had been shot in the hip and also in the head. The gunshot wound in his head was determined to be the cause of his death, which occurred on November 27, 1975.

Shortly after the robbery, both Simpson and Immich were shown numerous photographs, including pictures of Murrell, but neither was able to identify the robber who held the gun.

Murrell was arrested on other charges on September 21, 1976, some ten months after the robbery. A .38 caliber Smith & Wesson revolver was found in Murrell's hotel room at the time of his arrest. His picture and a story about his arrest were published in a Wichita newspaper, and both Simpson and Immich saw the

article. A few days later, both men attended a lineup held by Wichita police, and both identified Murrell as the man who held the gun. A complaint was then filed, charging Murrell with aggravated robbery, aggravated assault, two counts of unlawful possession of a firearm, and the murder of Joe Clay.

Murrell first contends that the trial court erred in refusing to let him use a prior inconsistent written statement of a prosecution witness, Terry Simpson, either during cross-examination or by introduction of the statement into evidence. Simpson testified on direct examination that he got a good look at the man with the gun, and he identified Murrell as that man. Before trial, defense counsel went to Simpson's home and interviewed him. Simpson came to counsel's office a few days later and signed a written statement which counsel had dictated from notes made during the interview.

At trial, Simpson acknowledged that the notarized signature on the written statement was his; he recalled the interview; but upon reading the statement, he testified that he did not remember the contents of the statement and he did not remember reading the statement before he signed it. Counsel attempted to use the document in cross-examination, but objections by the state were sustained. Counsel then attempted to introduce the statement into evidence; again, the state's objections were sustained. The defense called as witnesses the secretary who typed and notarized the statement, and an investigator who was present during the interview by counsel. Both testified that Simpson read the statement before he signed it; and the investigator testified that the document accurately reflected what Simpson said during the interview. The trial court ruled that because the witness testified that he did not remember what he said in the statement, and because he testified that he could not recall reading it before he signed it, no proper foundation was laid, and the statement could not be received in evidence or be used for any purpose in the trial.

Careful attorneys for both sides customarily take statements from potential witnesses for three purposes: to learn what the witness knows about the facts; to refresh the witness's recollection in case he forgets or deviates materially from his prior story during his testimony; and to impeach, if the witness persists in the deviation. The trial court's ruling would defeat the latter purposes, for if the witness testifies from the stand that he *does*

not recall the content of the statement, or whether he read it before signing it, the statement could not be used for those purposes. Such is not our rule.

K.S.A. 60-422 provides:

"As affecting the credibility of a witness (a) in examining the witness as to a statement made by him or her in writing inconsistent with any part of his or her testimony it shall not be necessary to show or read to the witness any part of the writing provided that if the judge deems it feasible the time and place of the writing and the name of the person addressed, if any, shall be indicated to the witness; (b) extrinsic evidence of prior contradictory statements, whether oral or written, made by the witness, may in the discretion of the judge be excluded unless the witness was so examined while testifying as to give him or her an opportunity to identify, explain or deny the statement;"

In *Smith v. Blakey, Administrator,* 213 Kan. 91, 515 P.2d 1062 (1973), we reviewed a trial court's ruling that a foundation needed to be laid for prior inconsistent written statements, with which defense counsel attempted to impeach a witness. In Syllabus ¶ 6 we said: "A foundation need not be established to use a prior written statement for impeaching a witness except as provided in K.S.A. 60-422." We quoted the statute in our opinion, and then said:

"The record reveals the time and place of taking the prior statement and the name of the person addressed were disclosed. Taken as a whole, we are satisfied the court erred in unduly restricting defendant's impeachment of this witness." (p. 99.)

Similarly, in *State v. Gauger,* 200 Kan. 515, 438 P.2d 455 (1968) prior inconsistent written statements were used by the prosecution to impeach defense witnesses, but neither statement was offered or received in evidence. On appeal, defendant contended that it was error for the county attorney to read the statements to the jury in his closing argument. We said:

"By Garrett in effect admitting that he made the portions of the statement read to him, and that it was perhaps inconsistent with his testimony, there was no necessity to introduce the statement itself for impeachment purposes. (*Lewis v. State,* 4 Kan. 296; Gard, Kansas Code of Civil Procedure § 422.) Therefore, the county attorney's argument relative to Garrett's testimony was within permissible bounds.

"The objection to the argument concerning the inconsistency of Nason's prior statement is more serious, for he did not admit the specific inconsistency. In fact, Nason testified he didn't remember what he had told the police. After Nason's so testifying, it was incumbent on the county attorney to introduce the prior statement into evidence or produce evidence of its contents if he wished to pursue the

matter in his closing argument to the jury. *Where the impeaching statement is written, and the witness, although admitting that he gave a statement, cannot remember the contents thereof, or will neither admit nor deny the same, there is ample foundation for admitting the statement itself or at least the impeaching portion thereof into evidence.* [Citations omitted.] It is well settled that prior inconsistent statements made by a witness out of court may be shown to impair his credibility." (Emphasis supplied.) (p. 520.)

In the case before us, the witness was first shown the statement and asked to read it silently. He was told the time and place of the interview, and that the statement was taken by defendant's attorney. Counsel more than met the conditions which might have been imposed by the trial court under K.S.A. 60-422(*a*). Clearly, the trial court erred in refusing to permit the defense to impeach the witness by use of the written statement.

Also, since the witness did not recall the content of the statement, and since the witness had an opportunity to identify, explain or deny the statement while he was testifying, there was ample foundation for the admission of the statement in evidence under the rationale of *Gauger,* 200 Kan. at 520, and under K.S.A. 60-422(*b*). The trial court erred in excluding it.

We must next decide whether the errors were prejudicial, since we must "disregard all mere technical errors and irregularities which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining." K.S.A. 60-2105. Appellant has the burden not only to establish error, but to establish that the error resulted in substantial prejudice to his rights. *State v. Holt,* 223 Kan. 34, 45, 574 P.2d 152 (1977). Where there is a wealth of overwhelming and compelling evidence, however, errors in the admission or the exclusion of evidence must be deemed harmless. *Holt,* at 45.

The principal evidence that Murrell robbed the G & R Market at gunpoint and committed the other offenses arising from that occurrence is the testimony of the two men who were present— George Immich and Terry Simpson. Neither could identify Murrell from photographs immediately after the robbery. Both first identified him ten months later at a police lineup, after reading about Murrell and after seeing his picture in the newspapers. The written statement contradicts Simpson's testimony in several crucial areas, and could well have influenced the jury as to his credibility. Although the investigator testified as to the oral statements made by Simpson, we cannot say that his testimony had

the same effect on the jury as would Simpson's written statement, signed and sworn to before a notary public.

The state founded its case primarily upon the identificatory testimony of Immich and Simpson, both of whom made a positive in-court identification of Murrell. In addition, Joe Clay's mother testified that she had seen Murrell and her son together on two prior occasions, and there was evidence that Clay, Murrell and a third man robbed a Hutchinson, Kansas, market about two weeks before the G & R robbery. The revolver Murrell had in his hotel room at the time of his arrest was not shown to be the same firearm used in the G & R robbery, or in the shooting of Joe Clay. Clearly, the evidence implicating Murrell, while substantial, was not "overwhelming and compelling." Simpson's testimony was critical. We conclude that the error in excluding Simpson's statement was not harmless, but resulted in substantial prejudice to the defendant. A new trial must be granted.

Defendant next contends that the trial court erred in restricting defense counsel's cross-examination of George Immich. Counsel attempted to show that Immich was "exposed to people who were locked up" while he was in the military service. Defendant contends that this line of questioning would tend to show bias on the part of the witness. The court sustained the state's objection, saying:

"I'll let you go into areas affecting credibility but not to areas of bias . . . bias does not mean a person is not credible.

. . . . .

"[B]ias does not in and of itself affect credibility and unless you can convince me that you are attacking the man's credibility I'm not going to allow questions, because he has a hard light towards anything doesn't mean he's not an honest and trustworthy or truthful man."

Bias and prejudice are often used interchangeably. Both connote prejudgment, a leaning towards one side, and partiality. One of the principal purposes of cross-examination is to explore areas of possible bias, prejudice, hostility, interest, or relationship, all of which may affect the credibility of the witness. The fact that the witness may have had some exposure to prisoners in military stockades may not have affected his attitude towards this defendant and his testimony in this case; on the other hand, such experience could have had some effect, particularly in view of defendant's extensive prior criminal record.

In *State v. Montañez,* 215 Kan. 67, 523 P.2d 410 (1974), we said:

"Bias, interest or improper motives of a witness may always be shown in order to place his testimony in proper perspective (*State v. Pierson,* 202 Kan. 297, 301, 448 P.2d 30). Only recently in a confrontation case the federal supreme court iterated its recognition that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination (*Davis v. Alaska,* 415 U.S. 308, 39 L.Ed.2d 347, 94 S.Ct. 1105)." (p. 72.)

Although the extent of cross-examination in this area lies within the sound discretion of the trial court, we hold that the trial court was in this instance unduly restrictive. Immich was an important and critical witness on the subject of identification, the principal issue in dispute. Greater latitude should have been allowed.

Murrell contends that the evidence was insufficient to support the jury's verdict, and that the trial court erred in denying defendant's motion for acquittal at the close of the evidence. In a criminal case, the issue on appeal is not whether the evidence establishes guilt beyond a reasonable doubt, but whether the evidence is sufficient to form the basis for a reasonable inference of guilt when viewed in the light most favorable to the state. *State v. Berry,* 223 Kan. 566, Syl. ¶ 3, 575 P.2d 543 (1978). Upon a review of the record before us we hold that the evidence was clearly sufficient. The tests to be applied by the trial court when ruling on a motion for acquittal were set out in the recent case of *State v. Holt,* 221 Kan. 696, 700, 561 P.2d 435 (1977) and need not be repeated here. The trial court did not err in its application of those tests. This point lacks merit.

Next, appellant contends that the trial court erred in admitting evidence of the robbery of a Hutchinson market by Murrell, Clay, and another, some 16 days prior to the G & R market robbery. The evidence was admitted under K.S.A. 60-455 to show identity. The two offenses were committed in a substantially similar manner. The trial judge first held a hearing outside the presence of the jury. He found that the evidence was relevant to prove identity, which was in issue, and that the probative value of the evidence outweighs any tendency it might have to prejudice the jury. He then admitted the evidence under a proper limiting instruction.

Murrell attacks only the court's finding that the probative value of the evidence outweighs its prejudicial effect, in view of what he characterizes as the state's "weak" identification testimony. The latter was the testimony of Immich and Simpson, discussed

earlier in this opinion; it was not necessarily "weak." We hold that the trial court followed the required procedure and properly applied the balancing test. *State v. Bly,* 215 Kan. 168, 523 P.2d 397 (1974). The trial court did not abuse its discretion in admitting evidence of the earlier, similar robbery.

Defendant contends that inflammatory remarks by the prosecutor in his closing argument require a reversal of defendant's conviction. The closing portion of the argument reads:

"When he got up on the stand the defendant told you, he said his occupation, he was a hustler and a gambler. . . . I think, Ladies and Gentlemen, that after you deliberate and after you follow the law and after you find the truth, you will find that the defendant, his occupation is, in fact, a hustler, is in fact a gambler, but I think you will also be able to add two more; that he's an armed robber and a cold-blooded killer. I believe that.

"MR. SCIMECA: Objection to that remark, Your Honor, as not being founded on the evidence.

. . . . .

"It's highly inflammatory too.

"THE COURT: I would instruct the jury that they are to disregard any statement tendered that tends to prejudice, and that the comments of the attorneys only be considered in the light of the evidence as you remember it."

It is the rule in this jurisdiction that improper remarks by the prosecutor during final argument do not constitute reversible error where the jury is admonished to disregard them, unless the remarks are so prejudicial as to be incurable. *State v. Warbritton,* 215 Kan. 534, 527 P.2d 1050 (1974). See also *State v. Murrell,* 215 Kan. 10, 523 P.2d 348 (1974); *State v. Norwood,* 217 Kan. 150, 535 P.2d 996 (1975); *State v. Nelson,* 223 Kan. 572, 575 P.2d 547 (1978); *State v. Dorsey,* 224 Kan. 152, Syl. ¶¶ 1 & 2, 578 P.2d 261 (1978); *State v. Smith & Miller,* 224 Kan. 662, 585 P.2d 1006 (1978).

It is improper for a prosecutor to inject into closing argument his personal belief in the guilt of the defendant (see *State v. McClain,* 216 Kan. 602, 607, 533 P.2d 1277 [1975]); but the statement before us does not do that. Taken in context, the prosecutor's statement, "I believe that," at the close of his argument, refers back to his assertion that "I think . . . you will find that the defendant . . . is . . . a hustler . . . a gambler . . . an armed robber and a cold-blooded killer."

Clearly, the remarks were not "so prejudicial as to be incurable." The court acted promptly, and no prejudice resulted.

We have considered the other points raised, and find no merit in them.

The judgment is affirmed as to defendant's conviction and sentence for unlawful possession of a firearm at the time of his arrest in September, 1976, since that judgment is not affected by any trial errors; the judgment is reversed as to the other offenses, with directions to grant a new trial.

McFARLAND, J., dissenting: I agree that the trial court should have admitted the Terry Simpson statement. However, I would not reverse for the failure to do so. The record reveals that the witness recalled giving the statement and signing it. He did not remember anything in the statement and stated that reading it would not refresh his memory. The crime occurred almost a year prior to the giving of the statement and the trial. Therefore, we are not talking about a "fresh" statement as opposed to "stale" trial testimony.

Defense counsel thoroughly established through testimony of others that the witness gave the statement, read the statement, and swore to it. In addition he established each discrepancy through such other testimony. The statement was one defense counsel had taken and he had full access to and knowledge of everyone involved with its taking. In addition, defense counsel fully argued the inconsistencies in closing argument. The impeaching effect, under these circumstances, was greater than if the witness had been permitted to explain the inconsistencies. In my opinion, no prejudicial error is shown. I would affirm.